# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:24-CV-24066-CMA

ALAN GUERECA, individually
and on behalf of all others similarly situated,

               Plaintiff,

     v.

MOTORSPORT.TV DIGITAL, LLC,

               Defendant.

## PLAINTIFF'S OPPOSITION TO DEFEFNDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION TO STRIKE

## I.     LEGAL STANDARD

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept all well pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Jackson v. BellSouth Telecomm.'s*, 372 F.3d 1250, 1262 (11th Cir. 2004).  A court may not look beyond the pleadings when deciding a Rule 12(b)(6) motion.  *Est. of Malkin v. Wells Fargo Bank, NA*, 998 F.3d 1186, 1201 (11th Cir. 2021).  To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.    THE VPPA

Congress passed the VPPA in 1988.  President Reagan signed the legislation into law that same year.  It is designed to protect the privacy interests of consumers who request or obtain video materials from commercial providers of such services.  The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  It defines "personally identifiable information" (hereinafter "PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).   It defines a "video tape service provider," in relevant part, as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ."  18 U.S.C. § 2710(a)(4).  The VPPA provides that a "video tape service provider who knowingly discloses, to any person, [PII] concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided [below]."  18 U.S.C. § 2710(b).  Disclosures

1

of PII made after the receipt of a customer's "informed, written consent," subject to other requirements, are one of several exceptions in the law.  18 U.S.C. § 2710(b)(2).

**III.**    **ARGUMENT**

A "plausible claim" under the VPPA requires a plaintiff to allege that (1) the defendant is a "video tape service provider," (2) the defendant disclosed "[PII] concerning any customer" to "any person," (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by the statutory exceptions. *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015).  Plaintiff has plausibly stated a claim for a violation of the VPPA by pleading facts which, taken as true, establish each element of an offense.

Defendant centers its initial dismissal argument on the second and third elements of a VPPA claim, and as a fallback asserts that Plaintiff's VPPA claim is defeated by Plaintiff's informed, written consent. First, Defendant argues that the Complaint (ECF No. 1, cited herein as "Comp.") fails to "support [Plaintiff's] allegation that Motorsport implemented the Meta Pixel on the Website or that information regarding his interaction with the Website and Content was transmitted to Meta."  (Motion (cited as "Mot."), ECF No. 12, at 4).  Second, Defendant argues that the Complaint fails to allege that Defendant transferred PII because a Facebook ID ("FID") is not VPPA-covered PII.   *Id*. at 5.  These assertions run plainly contrary to the allegations in the Complaint and well-established case law applied to substantially similar allegations by courts across the country.  Defendant's motion should be denied.

**a.  The Complaint Alleges Defendant Knowingly Made the Disclosures**

The Complaint alleges throughout that Defendant knowingly disclosed its consumers' personally identifiable information to Meta by installing the Meta Pixel on its website in order to

improve its marketing and advertising abilities.  As explained more fully below, Defendant's arguments to the contrary must be rejected.

### i.  Defendant Installed the Meta Pixel on the Website Knowing and Intending that It Would Transmit Personally Identifiable Information to Meta

Defendant asserts in passing, cursory fashion that that Plaintiff failed to allege that Defendant implemented the Pixel on the Motorsport.tv website or that Plaintiff's PII was transferred to Meta, specifically claiming that the Complaint fails to allege the name of the video transmitted to Meta, the type of device and web browser used, when the disclosures occurred, and how Plaintiff discovered it, or that Plaintiff's FID was transferred to Meta.  (Mot. at 4, 7). Defendant's assertions are baseless and it has not provided any legal authorities to support the heightened pleading standard that it proposes apply to here.

Courts have routinely held that a defendant who installs the Meta Pixel on its website knowingly makes disclosures to Meta, just as Plaintiff's Complaint alleges.  For example, in *Czarnionka v. Epoch Times Association, Inc.*, the defendant argued that the plaintiff had not plausibly alleged that "Epoch even knew the Facebook ID existed much less that Epoch considered the Facebook ID to be PII or knew it was transmitted[.]". 2022 WL 17069810 at *3. The court soundly rejected this argument based on the complaint's allegations that the defendant programmed the Meta Pixel into its website code and knew that it would transmit video titles and Facebook IDs to Meta.  *Id.*  Other courts considering the issue have consistently reached the same conclusion.[1]

---

[1] *See, e.g.*, *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342-43 (N.D. Ga. 2022) (denying motion to dismiss); *Frawley v. Nexstar Media Grp. Inc.*, No. 3:23-CV-2197-L, 2024 WL 3798073, at *1 (N.D. Tex. July 22, 2024), *report and recommendation adopted*, No. 3:23-CV-2197-L, 2024 WL 3807700 (N.D. Tex. Aug. 13, 2024) (same); *Li v. Georges Media Grp. LLC*, No. CV 23-1117, 2023 WL 7280519, at *4 (E.D. La. Nov. 3, 2023) (same); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1021 (D. Minn. 2023) (same); *Harris v. Pub. Broad. Serv.*, 662 F. Supp. 3d

Here, the Complaint sufficiently alleges that Defendant knowingly disclosed its consumers' Facebook IDs and URLs identifying and containing the names of the videos the consumers requested or obtained to Meta.  Additionally, Plaintiff alleges that Defendant installed the Meta Pixel on its website knowing that it would transmit the personally identifiable information to Meta.  For example, the Complaint states:

> Defendant knowingly disclosed [Plaintiff's and Class members' Private Viewing Information] to Meta because Defendant intentionally installed and programmed the Meta Pixel code on its Website, **knowing that such code would transmit to Meta the subscription purchases and video titles requested by its customers and its customers' unique identifiers** (including FIDs) when the subscribed to or requested or obtained videos from its website.

Comp, ¶ 71 (emphasis added).  Further, the Complaint contains numerous other allegations that clearly establish Defendant's knowing disclosures:

- "Plaintiffs brings this action to redress and put a stop to Motorsport.tv Digital, LLC's  practices of **knowingly disclosing** Plaintiff's and its other customers' identities, their subscriptions, and the titles of the prerecorded video materials that they purchased to Meta . . . ." *Id*. at ¶ 1 (emphasis added)

- "[T]he Meta Pixel technology transmits the customer's personally identifying information and detailed personally identifying information and detailed information concerning the specific interactions the subscriber takes on its website (…revealing the specific titles of the prerecorded video material that he or she purchased) to Meta . . . ." *Id*. at ¶ 42 (emphasis added).

- "Defendant **intentionally programmed its website (following step-by-step instructions form Meta's website) to include the Meta Pixel** that systematically transmits to Meta the FID of its customers, any subscription purchase, and the specific titles of video products that the customer requested in order to take advantage of the targeted advertising and other informational and analytical services offered by Meta." *Id*. at ¶ 51(emphasis added).

- "With only a person's FID and the video content name or URL that the person requested on Defendant's website – **all of which Defendant knowingly provides to Meta** – any ordinary person could learn the identity

---

1327, 1336 (N.D. Ga. 2023); *Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 311 (D. Mass. 2022) (same); *Adams v. Am.'s Test Kitchen, LP*, 680 F. Supp. 3d 31, 43 (D. Mass. 2023) (same).

of the person to whom the FID corresponds and the specific video products or services that this person requested. *Id*. at ¶ 52 (emphasis added).

- "Defendant's practices of **disclosing consumers' purchases of subscriptions and Private Viewing Information to Meta** continued unabated for the full duration of the time period relevant to this action." *Id*. at ¶ 53 (emphasis added).

- "**Prior to transmitting its customers' Private Viewing Information to Meta**, Defendant failed to notify Plaintiff or any of its other customers that it would do so[.]" *Id*. at ¶ 56 (emphasis added)

- "**By intentionally disclosing to Meta Plaintiff's and its other customers' FIDs** together with the subscription information and specific video content they each requested or obtained, without Plaintiff's or any of its other customers' consent to these practices, Defendant knowingly and systematically violated the VPPA on an enormous scale." *Id*. at ¶ 57 (emphasis added)

- **Defendant instead chose to program its Website so that all of its customers' Private Viewing Information is disclosed to Meta**." *Id*. at ¶ 73 (emphasis added).

Any one of these allegations, standing alone, would be sufficient to allege Defendant's knowing disclosure of Plaintiff and the Class's PII. Taken together, they paint a comprehensive picture of how Defendant intentionally and knowingly utilized the Meta Pixel to disclose its consumers' personally identifiable information to Meta to improve its own marketing and advertising abilities. Defendant's assertion that the Complaint inadequately alleges its intentional implementation of the pixel or the nature of the transmissions of PII is plainly unfounded.

**b. The Complaint Alleges that Defendant Disclosed "Personally Identifiable Information" Within the Meaning of the VPPA**

As courts have overwhelmingly recognized, allegations that a defendant transmitted Facebook IDs and URLs identifying or naming prerecorded videos requested or obtained by consumers satisfy the pleading standard for "personally identifiable information" within the meaning of the VPPA. *See Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 159 (S.D.N.Y. 2023).

### i.     Courts uniformly hold that transmissions of Facebook IDs and URLs to Meta constitute disclosures of "Personally Identifiable Information"

Courts have consistently held that Facebook IDs disclosed to Meta in combination with the URLs or names of videos requested or obtained by consumers constitute "personally identifiable information" under the VPPA.  The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  In this case, the Complaint alleges that Defendant disclosed to Meta the Facebook IDs of visitors to its website, and that its disclosure of those Facebook IDs was paired with the URLs of the webpages where consumers watched or purchased prerecorded videos and the titles of those videos from Defendant.  Comp., ¶¶ 10, 13, ¶¶ 49-57.  Facebook IDs are personally identifying to Meta because they are indexed to an individual's Meta account, which includes the individual's first and last name, birth date, gender, and phone number or email address.  *Id*. at ¶ 3, 43.  To the wider public, Facebook IDs are personally identifying because anyone in possession of a Facebook ID can use it to identify a person's Facebook account, which displays their name and other identifying information.  *See, e.g.*, *id*. at ¶¶ 3, 46.

Courts have held that substantially similar disclosures sufficiently allege "personally identifiable information" within the meaning of the VPPA.  *See, e.g.*, *Harris v. Pub. Broad. Serv.*, 662 F.Supp.3d 1327, 1334 (N.D. Ga. 2023) (holding that the "bundling of the [Facebook ID] from the c_user cookie with the URLs of the videos Plaintiff watched" satisfies the disclosure element); *Belozerov v. Gannett Co.*, 646 F.Supp.3d 310, 314 (D. Mass. 2022) (finding a Facebook ID meets the definition of personally identifiable information) (collecting cases); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342 (N.D. Ga. 2022) ("[Plaintiff] adequately alleged that [defendant] disclosed her Facebook ID and email address in connection with her video viewing information

to Facebook and that the disclosure of such information constituted a disclosure of PII."); *Ellis v. Cartoon Network, Inc.*, No. 14 Civ. 484 (TWT), 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) (same), *aff'd on other grounds*, 803 F.3d 1251 (11th Cir. 2015).

Defendant relies on inapposite decisions where complaints were dismissed for technical pleading deficiencies, namely failures to allege that the plaintiffs' Facebook accounts contained their names.   *See* Mot at 4-6 (citing *Heerde v. Learfield Commc'ns, LLC*, No. 2:23-CV-04493-FLA (MAAX), 2024 WL 3573874 ("Plaintiffs fail to allege their PII was disclosed because they do not identify what information on their Facebook pages, if any, was viewable and could be used to identify them."); *Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1307 (N.D. Fla. 2023) (granting a motion to dismiss where the complaint "contain[ed] no allegation as to what information was actually included on [their] [Facebook] profile[s], such as their names or birthdays."); *Smith v. Trinity Broad. of Texas, Inc. et al*, No. 8:24-CV-01046-JVS-ADS, 2024 WL 4394557, at *3 (C.D. Cal. Sept. 27, 2024) (dismissing VPPA complaint because plaintiff did not indicate that her Facebook profile contained "any identifying information or photos.").   These authorities in turn rely on the "ordinary person" standard discussed in *In re: Nickolodeon Consumer Priv. Litig.*, 827 F.3d 262, 283 (3d Cir 2016) which holds that information is VPPA-covered PII only if would readily permit an ordinary person to identify an individual, which typically does not include numeric identifiers such as IP addresses.   But the *Nickelodeon* decision itself recognized that "even a numeric identifier might qualify as personally identifiable information, at least in certain circumstances."   827 F.3d at 289 n.174.   Plaintiff has specifically alleged that an ordinary person *could* use an FID to identify a person by simply entering the FID into a web browser.   Comp. ¶ 3 ("Entering "facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds."); Comp. ¶ 52 ("With only a person's

FID and the video content name or URL that the person requested on Defendant's website—all of which Defendant knowingly provides to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the specific video products or services that this person requested. This can be accomplished simply by accessing the URL www.facebook.com/[unencrypted FID]."). Thus, the Complaint's present allegations fully address any requirement that disclosed information be capable of use by an ordinary person to identify an individual.[2] *See e.g., Martinez v. D2C, LLC*, No. 23-21394-CIV, 2023 WL 6587308, at *4 (S.D. Fla. Oct. 10, 2023) (Scola, J.) (citations omitted) ("Assuming the "ordinary person" standard applies, as Univision submits, the Court finds the proposed amended complaint's allegations sufficient: "The [Facebook ID] is a unique identifier that is enough, on its own, to identify a person."). Plaintiff need not have alleged the specific information on his Facebook page because, as the Complaint alleges, any ordinary person could personally identify Plaintiff based on his FID. Within a few keystrokes an ordinary person could navigate to Plaintiff's page where they would encounter his Meta Profile, which, in turn "publicly identifies the person by name, and contains other personally identifying information about the consumer as well[.]" Comp. ¶ 4.

Notably the Complaint's allegations are almost identical to those in *Jackson v. Fandom, Inc.*, which the *Heerde* court cited having adequately pled the disclosure of a Facebook ID was personally identifiable information. No. 22-cv-04423-JST, 2023 WL 4670285, at *4 (N.D. Cal.

---

[2] The "ordinary person" standard is applicable in the Third and Ninth Circuits but has not been specifically adopted in the Eleventh Circuit. *See Martinez*, 2023 WL 6587308, at * 4 (S.D. Fla. Oct. 10, 2023). The First Circuit takes an approach focused on the fact of disclosure by the Videotape Service Provider rather than the capabilities of the recipient. *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016) (holding that the term "personally identifiable information" encompasses "information *reasonably and foreseeably* likely to reveal which . . . videos [a person] has obtained."). Plaintiff submits that *Yershov's* formulation is the one more consistent with the VPPA's plain statutory text and purpose.

July 20, 2023) (finding personally identifiable information alleged where the plaintiff claimed that "a user's Facebook profile may contain the user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts."); *see Heerde,* 2024 WL 3573874 at *4. Here, the Complaint states: "a consumer's FID is a unique sequence of numbers linked to the Meta profile belonging to that consumer. The consumer's Meta profile, in turn, publicly identifies the person by name, and contains other personally identifying information about the consumer as well." Comp. ¶ 4. It alleges that a Facebook ID "identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person." *Id.* It further alleges that in order to create a Meta account (and obtain a corresponding Facebook ID), an individual needs to provide Meta their name, birthday, name, and phone number or email address. *Id.* at ¶ 43. Finally, the Complaint ties those allegations to the Plaintiff by alleging that Plaintiff was a Meta user, *id.* at ¶ 7, had a Meta account, a Meta profile associated with the account, and an FID associated with the profile. *Id.* at ¶11; *see also Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1020–21 (D. Minn. 2023) (finding that a plaintiff plausibly alleged his personally identifiable information was disclosed via the Meta Pixel when he alleged that his Facebook profile contained his name, "making it feasible to identify [him] by reference to this information."). The Complaint alleges each of the essential elements of a VPPA claim and a plausible entitlement to relief. Accordingly, the Court should deny the Motion.[3]

## c. DEFENDANT'S CONSENT DEFENSE IS PREMATURE, UNPROVEN, AND FAILS ON THE MERITS

---

[3] If the Court grants the motion Plaintiff respectfully requests leave to amend.

Defendant asserts that "Plaintiff provided Consent under 18 U.S.C. 2710(b)(2)(B)[4] to the alleged conduct and the Complaint must be dismissed." (Mot. at 13).  Defendant's argument for dismissal based on Plaintiff's purported consent to its disclosure of Plaintiff's PII fails because Defendant's consent defense is premature in the first instance, and in any event is unproven, and legally deficient.

### i.    Consent is an affirmative defense which cannot be resolved on a motion to dismiss

Consent is an affirmative defense to a VPPA claim.  *See e.g., Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1023 (D. Minn. 2023); *Adams v. Am.' s Test Kitchen, LP*, 680 F. Supp. 3d 31, 43–44 (D. Mass. 2023).  "For an affirmative defense to justify a Rule 12(b)(6) dismissal of a complaint, 'the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion.'" *Feldman*, 659 F. Supp. 3d at 1023 quoting 5B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 1357 (3d ed. & Apr. 2022 Update); *see also Quiller v. Barclays Am. Credit,*

---

[4] Under the VPPA a "'videotape service provider' may disclose personally identifiable information concerning any consumer

  …

(B) to any person with the informed, written consent (including through an electronic means using the Internet) of the 'consumer' that—

(i)  is in a form distinct and separate from any form setting forth other legal or financial obligations of the 'consumer'

(ii) at the election of the <u>consumer</u>—

   (I)    is given at the time the disclosure is sought; or

   (II)    is given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the 'consumer' whichever is sooner; and

   (III)    the 'videotape service provider' has provided an opportunity, in a clear and conspicuous manner, for the 'consumer' to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the 'consumer's' election[.]

18 U.S.C. 2710(b)(2)(B)

*Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984) ("a complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint.").

Here, the Complaint makes no mention of, or reference to, the purported Privacy Policy. *See generally* Complaint.  Rather, Defendant seeks to put the Privacy Policy before the Court by the Declaration of Ranier Ehrhardt.  ("Ehrhardt Declaration," ECF No. 12-1).  But Defendant offers no argument for why, in the absence of clear factual support for the Privacy Policy's existence on the Complaint's face, the Court could consider the Privacy Policy (or for that manner, any aspect of the Ehrhardt Declaration) on a motion to dismiss, nor does Defendant cite any authority from the ample body of VPPA caselaw supporting that a court may grant a motion to dismiss on consent grounds based on a Privacy Policy attached to a motion.[5] *See generally* Mot at 8-13.  This is because it appears no court has.  Facing an identical consent defense based on a website privacy policy at the motion to dismiss stage, the court in *Adams* noted that, as here, "a close reading of the complaint reveals no reference to Defendants' privacy policies. Therefore, the Privacy Policy is not properly before the Court, and Defendants' argument regarding consent fails at this stage." 680 F. Supp. 3d at 44.   The *Adams* court's approach was correct and is the same one taken by other courts in the context of analogous privacy statutes.  *See e.g.*, *Mittelmark v. Yoga*

---

[5] Defendant mistakenly relies on cases the arise under frameworks where a Court may properly consider matters outside the pleadings.  *See Valiente v. StockX, Inc.*, 645 F. Supp. 3d 1331, 1337 (S.D. Fla. 2022) (Mot. at 7) (concerning a motion to compel arbitration); *Segal v. Amazon.com, Inc.*, 763 F. Supp. 2d 1367, 1369 (S.D. Fla 2011) (Mot. at 7) (concerning a motion to transfer venue).  But in adjudicating a 12(b)(6) motion the Court is limited to the pleadings, and the cited authorities are inapposite. *See Boyd v. Peet*, 249 Fed. Appx. 155, 157 (11th Cir. 2007) ("[A]t the motion to dismiss stage, the scope of a court's review must be limited to the four corners of the complaint").

*Joint S., LLC*, No. 18-62138-CIV, 2018 WL 11460013, at *4 (S.D. Fla. Dec. 17, 2018) (Dimitrouleas, J.) (internal citation omitted) (stating in a TCPA action: "the Court cannot go outside of the pleadings at this stage of the litigation to consider Defendants' exhibit to its Motion to Dismiss –[Defendant's] Waiver and Customer Agreement– which Defendants submit in their attempt to prove their alternative affirmative defense of 'express prior written consent.'").  This Court should follow suit.

Moreover, Plaintiff specifically alleges in the Complaint that he (a) "never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Meta" and that (b) "Defendant has never even provided Plaintiff with written notice of its practices of disclosing its customers' subscription information and Personal Viewing Information to third parties such as Meta." (Comp.  ¶ 12).  These allegations are dispositive of the consent argument.  *See Jackson v. BellSouth Telecomm.'s*, 372 F.3d 1250, 1262 (11th Cir. 2004) (a court adjudicating a 12(b)(6) motion must accept the complaint's allegations as true and construe them in the light most favorable to the plaintiff); *Adams,* 680 F. Supp. 3d at  44 (D. Mass. 2023) (holding dismissal of a VPPA claim based on a website privacy policy was "inappropriate" at the pleadings stage where the Complaint specifically alleged, as here, the plaintiff's lack of informed, written consent under the VPPA statute).  Defendant would have the Court simply ignore this basic rule, disregard the Complaint's well pled allegations, wholly credit Defendant's assertion that Plaintiff did in fact consent to the disclosure of his PII to Meta, and dismiss the case without discovery into the facts.  The Court has refused to take that course in the past and should do so here as well.  *See Goldstein v. Simon*, No. 24-20633-CIV, 2024 WL 2132881, at *4 (S.D. Fla. Apr. 2, 2024) (Altonaga, C.J.) (internal citations and quotations omitted) ("consent…is an affirmative defense that…must be show[n] by a preponderance of the evidence.  The Court cannot resolve the defense

at the pleading stage where the parties dispute important facts."). The VPPA context is no different. Consent is an affirmative defense incapable of resolution on a motion to dismiss. *See Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1023 (D. Minn. 2023) (refusing to dismiss VPPA claim on a 12(b)(6) motion explaining that issue of consent should be addressed "if at all, on a sufficiently developed factual record and more thorough legal arguments."). As such, the motion should be denied.

### ii. Even if the Court could consider Defendant's consent defense, Defendant has failed to establish Plaintiff assented to its Privacy Policy

Defendant asserts that Plaintiff assented to its Privacy Policy by signing up for a Motorsport.tv account and that therefore Defendant received Plaintiff's "statutory consent under the VPPA." (Mot. at 8). Defendant relies on a screenshot from the Ehrhardt Declaration of what purports to be "substantially the same" as the registration screen Plaintiff encountered when he registered a Motorsport.tv account. Defendant's argument fails twice over. First, even if the Court considers the Ehrhardt Declaration's contents, and as explained above, it shouldn't, Defendant has not factually established under any standard that Plaintiff assented to the Privacy Policy by creating a Motorsport.tv account. Second, as set forth below, the Privacy Policy is *not* "informed, written consent" as required under the VPPA.

Looking at assent first, Defendant repeatedly refers to its registration screen as a "clickwrap agreement." (Mot. at 7-8). This is likely because clickwrap agreements are "usually enforce[d]" by courts. *Sgouros v. TransUnion Corp.*, 2015 WL 507584, at *4 (N.D. Ill. Feb. 5, 2015), *aff'd,* 817 F.3d 1029 (7th Cir. 2016). A clickwrap is a species of internet adhesion contract in which an internet user accepts a website's terms by clicking on a dialog box. *Davis v. USA Nutra Labs*, 303 F. Supp. 3d 1183, 1190 (D.N.M. 2018). The proffered screenshot here does not

13

depict a clickwrap agreement.[6]  Rather, the screenshot shows a "sign in wrap" agreement.  In a sign in wrap agreement "a website notifies the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advises the user that he or she is agreeing to the terms of service when registering or signing up."  *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *4 (N.D. Cal. Oct. 19, 2020).  Enforceability of these types of agreements is a nuanced question and depends on whether the site user was on "inquiry notice" that clicking a button to register an account, checkout, or otherwise proceed through a website flow bound the user to the linked terms. *See Eakins v. Whaleco Inc.*, 721 F. Supp. 3d 1252, 1258 (W.D. Okla. 2024).  "To determine whether sign-in-wrap … agreements are enforceable, courts engage in fact-intensive inquiries of the layout and language of a website or application."  *Route App, Inc. v. Heuberger*, 2022 WL 2316377, at *3 (D. Utah June 28, 2022).  Among the factors courts examine are the distance between the advance button and the hyperlinks, the obviousness of the hyperlinks, and the simplicity or complexity of the overall design, all with an eye to determine whether a user had reasonable notice he was being bound to terms by pressing a button.  *See, e.g. Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 853 (9th Cir. 2022).  Here, based on the proffered screenshot a Motorsport.tv user encounters *multiple* hyperlinks at both the top part and lower part of the screen which link to different documents, *multiple* fields that are required to be filled in, and *multiple* dialogue boxes which a user can opt to click or not.  Further, the "Continue" button, which is larger than any other icon the screen, is completely spatially decoupled from the "Terms of service" and "Privacy Policy" hyperlinks, separated by a significant amount of fine print text.  Moreover, the

---

[6] *Compare Valiente v. StockX, Inc.*, 645 F. Supp. 3d 1331, 1338 (S.D. Fla. 2022) (cited by Mot. at 7) ("Plaintiff needed to affirmatively click a box indicating that he agreed to Defendant's Terms and Privacy Policy.").  To be clear, the screenshot does contain two clickable dialog boxes – by the first, the user certifies he is "not a robot," and by the second, that the user is requesting the Motorsport.tv newsletter.  *See* Mot. at 2.

hyperlinks lack the classic indicia of being underlined.  *See e.g., Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 64 (1st Cir. 2018).  And while the hyperlinks are blue, they are less than obvious given that the identical blue color is used throughout the screen in various places, including the prominent Continue button, thereby distracting the user's focus from recognizing the text as hyperlink.  Overall, Defendant cannot establish that the proffered screenshot put Plaintiff on inquiry notice that by clicking "Continue" he was agreeing to be bound by Defendant's Privacy Policy.

But setting aside the proffered screenshot's defects, Defendant has a fatal proof problem at this stage.  Defendant has not established by a preponderance of the evidence, or indeed by any standard, that the proffered screenshot is actually the screen Plaintiff encountered.  To explain, the Ehrhardt Declaration fails to include any records of Plaintiff's registration, including records showing the interface Plaintiff used to register a Motorsport.tv account – desktop or mobile – or the date on which Plaintiff registered his account.  The Complaint avers only that Plaintiff viewed on-demand videos on Defendant's website after purchasing a subscription in June 2023.  (Comp. ¶ 12).  The Ehrhardt Declaration does not specify whether its proffered screenshot was from the desktop version of its website or the mobile version, or the date on which it was obtained.  Defendant cannot establish that Plaintiff is bound by a Privacy Policy by virtue of a screenshot if it cannot conclusively state that the screenshot accurately depicts what Plaintiff encountered.  Defendant attempts to hedge by asserting its preferred screenshot is "substantially similar" to what Plaintiff saw.  (Mot. at 2) However, given the highly fact specific inquiry at issue, which requires the Court to dissect multiple design elements of the website, any of which could be altered by a few keystrokes, which would certainly appear differently based on the medium (desktop or mobile), or which could have been subject to an update on or after a given day, "substantial

similarity" is not enough.  Defendant has failed to establish Plaintiff assented to the Privacy Policy and the Motion should be denied on that additional ground.

### iii.      Defendant's Privacy Policy is not a substitute for VPPA-complaint consent

The VPPA's consent regime is straightforward.   To be compliant with the statute, at a minimum, a consumer's consent needs to "informed", "written", and in a "form distinct and separate from any form setting forth other legal or financial obligations of the "consumer."  18 U.S.C. § 2710(b)(2)(B).  Whether Plaintiff's consent was informed, of course, turns on whether he knew of the Privacy Policy's existence in the first place, a finding the Court cannot make at this stage because, critically, Plaintiff denies he consented.  But even if it were presumed that Plaintiff knew of the Privacy Policy, any purported VPPA consent contained in the Privacy policy, *which concerns only the disclosures to third persons of a person having requested or obtained specific video materials or services*, *see* 18 U.S.C. §2710(a)(3)*, is certainly not contained in a form "distinct and separate" from any other legal or financial obligation.  Myriad legal obligations – of both the Defendant and user – are discussed throughout.  The Privacy Policy initially notifies users that Defendant may collect, and users are therefore obligated to provide, users' names, email addresses, passwords, birthdates, location data and the like.  (ECF No. 12-1 at 19).  The next section, entitled "How we Use and Share your Personal Information" concerns a litany of subjects including, for example, Defendant's policies for: providing customers with sweepstakes offers, sending its customers mail and email, providing customers' email addresses to "sponsors, partners and affiliates[,]" adding customers to a third parties' "postal mailing lists" permitting third-parties to send customers surveys, and sharing customer's information in connection with online loyalty and rewards programs, among others. (ECF 12-1 at 20-21).  In other sections the Privacy Policy sets forth customers' rights regarding the collection of location data via Defendant's app, (*id* at 21) the

privacy of customers' contact lists when customers are playing "Mobile Games," (*id.*) Defendant's policy for the use of cookies and web beacons, (*id.*) the information Defendant shares with social networking sites (*id*), the sharing of customer data in the event of a corporate transaction, (*id.* at 23) customers' privacy rights with respect to a subpoena, warrant or court order, customers' rights under California Civil Code Section 1798.83 (*id.* at 25), and the rights of customers under age 13 under "federal law" with respect to the collection of personal information (*id.*), again, among many other topics.  That is all to say, Defendant's Privacy Policy concerns myriad subjects beyond solely the disclosure of video titles to third parties.  On its face, it is hardly a "form distinct and separate from any form setting forth other legal or financial obligations of the customer."  18 U.S.C. § 2710(b)(2)(B)(i).

Similar concerns undermined a proposed consent defense at the pleading stage in *Feldman*, where the court found that the defendant's privacy policy was not a proxy for VPPA-complaint "informed, written consent."  659 F. Supp. 3d 1006, 1023 (D. Minn. 2023) (denying Privacy Policy based consent challenge on ground that, *inter alia*, the privacy policy "appears to cover many legal obligations beyond consent to disclose personally identifiable information under the VPPA."); *see also In re Hulu Priv. Litig.*, 2014 WL 2758598, at *21 (N.D. Cal. June 17, 2014) (rejecting browser cookie policy was substitute to "informed, written consent" under the VPPA noting: "It is one thing to acknowledge the placement or use of cookies. It is another to interpret a data policy as the informed, written consent that the VPPA required during the class period.").[7]  Defendant has not

---

[7] Further, Defendant has failed to establish its compliance with the VPPA's requirement that consent may be withdrawn as desired.  *See* 18 U.S.C. 2710(b)(2)(B)(ii)(III).  Defendant points to a section of the Privacy Policy which contains a hyperlink that advises users they can "elect to opt out of targeted behavior advertising from many major third-party network advertisers by clicking here [on a hyperlink]."  However, Defendant offers no explanation as to whether such withdrawal stops the disclosure of VPPA-covered PII to Meta.  And in any event, the presence of a single hyperlink amongst 8 pages of fine print is, objectively, far from "clear and conspicuous."  *See Id.*

sufficiently established at this stage that Plaintiff consented to the disclosure of his PII to Meta such that dismissal is warranted.  Accordingly, the Court should deny the motion.

**d.  DEFENDANT'S ALTERNATIVE REQUEST TO STRIKE THE CLASS ALLEGATIONS SHOULD ALSO BE DENIED**

Defendant alternatively seeks that the Court strike the Complaint's class allegations for "judicial economy" purposes.  (Mot. at 16).  Defendant submits that because class certification was recently denied in an unrelated VPPA case in this district, and ten years earlier in an unrelated VPPA case in the Northern District of California, that "Plaintiff is unable to maintain a class." (Mot. at 16).  The argument is not well taken.

Under Rule 12(f), a court "may strike class allegations based on pleadings alone when it is evident from the face of a complaint that a plaintiff can plead no set of facts that would allow class certification."  *Brashevitzky v. Covanta Dade Renewable Energy, LLC*, No. 23-20861-CIV, 2024 WL 21589, at *2 (S.D. Fla. Jan. 2, 2024) (Altonaga, C.J.).  This court has more than once expressed the view that striking class allegations is to be employed rarely, stating: "But, as the undersigned has previously commented, it is rare for courts to strike or dismiss class allegations prior to the filing of class certification motions and discovery because class determination usually should be predicated on more information than the complaint itself affords[.]" *Id* at *2 (alterations added; citation and quotation marks omitted).  Plaintiffs are typically afforded the benefit of discovery to establish the Complaint's class allegations.  *See e.g., MSP Recovery Claims, Series LLC v. United Auto. Ins. Co.*, No. 20-20887-CIV, 2021 WL 720339, at *7 (S.D. Fla. Feb. 4, 2021) (Altonaga, C.J.) (internal citation omitted) ("Defendant moves to strike Plaintiff's class allegations. Quite simply, the Court will not be striking class allegations as facially defective at this time, before Plaintiff has had the opportunity to engage in discovery and determine whether, for example, its class definition should be amended or class certification even be requested.").

18

Notwithstanding the Court's clear guidance, Defendant seems to contend that striking the class allegations is in order because class certification would be impossible;  not based on what has been pled, but based on the non-certification outcome in a pair of non-binding, unpublished, district court VPPA decisions, *Martinez v. D2C, LLC*, No. 23-21394-CIV, 2024 WL 4367406 (S.D. Fla. Oct. 1, 2024) and *In re Hulu Priv. Litig*., 2014 WL 2758598, (N.D. Cal. June 17, 2014). Defendant not only misunderstands Rule 12(f), it misapprehends these cases.  In *Martinez*, a VPPA case based on the same Meta Pixel theory that Plaintiff advances here, the plaintiffs could not certify a class based on an inability to establish numerosity.  But it is clear from the decision that the problem was not an inherent flaw in the plaintiffs' theory liability evident from the face of the complaint, but the plaintiffs' inability to timely secure evidence.  *Martinez*, 2024 WL 4367406, at *6 (S.D. Fla. Oct. 1, 2024) (footnote omitted).

As the Court explained, the plaintiffs sought to establish numerosity by a combination of extrapolations from a Pew Research Study about the percentage of Americans that have a Facebook account, and figures concerning the percentage of internet users who use a cookie blocker on their browser.  *Id.*[8]  But the Court found it had no way of determining how many potential users were logged into their Facebook accounts when they viewed Defendant's website, had used the same browser for both Facebook and to view Defendant's website, and did not have a pixel blocker.  *Id.* at * 8.

Ultimately, it is clear from the decision that the plaintiffs lacked key information from Meta, Defendant, and Defendant's website vendor when they sought class certification.  By the

---

[8] Ostensibly, Plaintiffs had to take this approach because the district court denied the plaintiffs' request to extend discovery based on Meta's recalcitrance to produce documents which had been subpoenaed.  *See Martinez v. D2C, LLC*, No. 23-21394-CIV, 2024 WL 1254376, at *3 (S.D. Fla. Mar. 25, 2024)

time they obtained records from Meta relevant to numerosity, it was too late, as this evidence was presented for the first time in the plaintiff's reply brief and disallowed as being unfairly prejudicial. *Id.* at * 9.  The *Martinez* plaintiffs' inability to certify a class was not the result of an inherent problem with the theory that disclosures of PII via the Meta Pixel to Meta violate the VPPA, but rather, the plaintiffs' ability to timely obtain the necessary information from Meta to establish the scope and frequency of the defendant's VPPA violative disclosures.  It is thus overblown to state as Defendant does, that a "class cannot be certified in the context of VPPA litigation."  (Mot. at 14).  Here, Plaintiff has plainly pled each of Rule 23(a) and (b)(3)'s requirements, have set forth a plausible claim for relief on an individual and class wide basis, and should be afforded an opportunity to take discovery and pursue class certification.

Defendant's reliance on *In re Hulu Priv. Litig*., 2014 WL 2758598, (N.D. Cal. June 17, 2014) is equally misplaced.  In *Hulu* the Court denied class certification on the basis of ascertainability.  *Id.* at * 16.  But as Judge Scola found in *Martinez*, a VPPA pixel class is ascertainable, stating: "each of the criteria the Plaintiffs present is clear and capable of objective determination."  *Martinez*, 2024 WL 4367406, at *6 (S.D. Fla. Oct. 1, 2024).  When the time comes, Plaintiff here will likely propose the same or similar criteria accepted in *Martinez* (depending, of course, on what discovery reveals).  Far from being plain on its face that a class cannot be certified, every indication here is that a class is certifiable.  Defendant offers no good reason why Plaintiff should not have the opportunity to try.  Defendant's alternative motion to strike should be denied.

## IV.   <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons the Motion should be denied.

January 28, 2025                              Respectfully Submitted,
                                             s/*Arun G. Ravindran*

                                             Arun Ravindran, FBN: 66247
                                             Julie E. Holt, FBN: 95997
                                             **Hedin LLP**
                                             1395 Brickell Ave,
                                             Suite 610
                                             Miami, Florida, 33131
                                             Telephone: (305) 357-2107
                                             Fax: (305) 200-8801
                                             aravindran@hedinllp.com
                                             jholt@hedinllp.com
                                             ***Attorneys for Plaintiff and the Putative Class***